May it please the Court. Corley McCormick, Jr. of the McCormick Law Firm, on behalf of the appellants. We're across the room here, so I know you have a microphone, but keep it up a little bit. Speak so that we can hear more clearly. Yes, Your Honor. I appreciate it, yes. And, Your Honors, my clients are listening in by audio, and they wanted to let the Court know that they are intently listening to this case. Of the 95 participants in the 2019 reduction in force process at the Harford County Public Schools, only four of the assistant principals were African American women above age 40. After the reduction in force process, zero African American women above age 40 were retained by the school board. This was despite concerns which were initially raised by the assistant superintendent for human resources and additional concerns that were raised by former school board members. Those concerns were ignored, and a legal process was implemented, and it's well documented that all four of the assistant principals were highly effective in their roles and were demoted and not restored for discriminatory and retaliatory reasons. The lower court erred in determining that the plaintiffs failed to present facts or evidence of pretext in response to the defendant's so-called legitimate nondiscriminatory motives. The lower court, unfortunately, gave the defendants the benefit of the weight of every fact and every inference in their favor. There are evidentiary standards to determine whether pretext is acceptable before the court, and the recent cases from this court demonstrate that plaintiffs can establish pretext through two routes. First, by offering evidence that the employer's justification is unworthy of credence, and secondly, by presenting other forms of circumstantial evidence that are sufficiently probative of discrimination, and that was reestablished in the case of Wanamaker-Amos v. Purim-Novy, which was recently decided by this court in 2025. Also, in Wanamaker-Amos, this court determined that the plaintiffs presented, in that case, evidence of falsity of the employer's nondiscriminatory reasons for the adverse action. They also presented the employer's shifting and conflicting reasons for their determination and the employer's failure to follow disciplinary policies, and that was in an employment case. Here, this is a reduction in force or a RIF case, not discipline, and the employer, in this case, failed to follow the reduction in force policies. An even more recent case, this summer, from the court, that's Hollis v. Morgan State University, determined that the plaintiffs may present circumstantial evidence that the employer failed to follow its own internal policies. The deviations themselves, according to the court, are circumstantial evidence from which pretext and discriminatory intent may be inferred. So what exactly is the circumstantial evidence that you are alleging the district court failed to take into consideration? Thank you, Your Honor. There are two types. The first type would be the process type of circumstantial evidence, and that would include the violation of the procedures, including the RIF policy, the violation of the contract, the use of the – and then there's – I'm sorry, Your Honor. So you're not arguing that the RIF policy itself is evidence of pretext? You're – you concede that organizations can engage in reductions of force? Oh, yes. Yes, Your Honor. So you're not challenging the policy itself? You're arguing, as I understand it, that the policy wasn't followed? Thank you, Your Honor. Yes. The policy was not followed. In fact, there was an entirely new process that was implemented to supplant the RIF policy. So there was one RIF policy and then another RIF policy substituted for that RIF policy. But what evidence is there that the substitution of the RIF policy was in any way pretext for discrimination? Thank you, Your Honor. So the first policy required the defendants to consider qualifications, performance, and tenure, years of service. The replacement to that policy, one, it was never written or documented with respect to the deliberative process. Well, let me step back just a moment, Your Honor. The requirements for the applicants was documented. The applicants were required to submit to an interview and to submit resumes. The deliberative process, how the interview and then there were additional documents, supervisory references, and what was termed those were also included in the process and the decision makers had those and they were included in the process. There was never any documented rubric for how or if the defendants were required to consider all the evidence in the process. Does our case law require that there be, that the RIF process be documented? No, it doesn't require. So why is that evidence of pretext? It's evidence of pretext, Your Honor, because it allowed for the defendants to discriminate against the plaintiffs. And they would not have been able to do so had they followed the original process. So are you saying that the new process allowed more subjectivity? Yes, subjectivity, but also it was just completely arbitrary, Your Honor. So, for example, the defendants could have considered the interviews and the interview scores. They could have considered the supervisory references. They could have considered the top five lists, but they weren't bound by anything. And, again, since it's documented, you'd be hard-pressed to show anywhere how the defendants actually conducted this process. The only way we were able to discern it was through the depositions and piecing together other bits of evidence. Now, how did the prior process for RIF sure up those things and prevent what you say that opened the door for the subjectivity? Okay. Yes. So by limiting the process to qualifications, performance, and years of service, the plaintiffs would at least have been on notice that their performance, for example, would have been important in the process. According to the defendants, and I think there were several different depositions, there was really only one measure of performance, and that was the annual evaluation for the plaintiffs for assistant principals. We know that all four plaintiffs were deemed highly effective during their tenure at Harford County Public Schools. So we would submit that for performance, they certainly would have been deemed worthy candidates and high in the process. Secondly, with respect to terms of service, there were a lot of individuals who were far younger with less experience than the plaintiffs. So we're certain that we believe that the plaintiffs would have been able to demonstrate that had they used the original process, that especially someone like Janice Stallings, who had been there for, I believe, over 20 years, that because of her terms of service, because of her performance, and certainly the qualifications, she should have been high in the process in the rankings. All right. So your position is that when you take out things like performance and qualification and years of service, that's to the detriment of persons who are older and been there longer? Yes, Your Honor. Because then you don't have to use those. You can use other things. Is that your argument? Yes, Your Honor. So, Judge Berner, going back to your question, there are two separate pieces of types of evidence. The first would be the process type, and then the second would be the individual comparative type evidence, and that would be, one, the comparators that the plaintiffs included, and then also the supervisory references. Can I ask you about your retaliation claim? Is it true the plaintiff's EEOC charges filed after they learned that they had been demoted? Yes. So how could that be the basis of retaliation? Okay. Your Honor, so the retaliation claim includes the refusal to reinstate the plaintiffs shortly after the process, as well as the continuing refusal to reinstate the plaintiffs, for one. But also, Your Honor, the plaintiffs notified themselves. So your argument is that there was the retaliation wasn't the failure to appoint them as assistant principals. It was the failure to put them in those positions after they complained? It was the failure to reinstate them to the positions or replace them in the positions. They had to operate. The school board had the opportunity to do that, because this is not a termination case. The plaintiffs were not terminated. I understand. They were demoted. But essentially, what you're arguing is that it was retaliation not to settle, or not to reach an agreement, after a complaint was filed. The argument is what you originally stated, Your Honor, which is that after the plaintiffs were demoted from their positions, they were not reinstated back to those positions. So it was just a continuous violation. Well, I don't want to say – There was a pool, right, afterwards? Yes. There were several pools. And they filled, what, four more positions from the pool? During, I think, 2020 or 2021. But there were additional positions each year. Yeah. But the pool remained open for three years, right? Yes. Yes, the AP pool. And there were four more assistants during that period that were appointed from the pool. If the candidate didn't succeed the first time, then you could be in the pool, right? Yes, correct. And then they had the pool. And if I understand correctly, they appointed four more. There were at least four. And of those four, two of them were African American. There were two African American women who were appointed. However, one of those individuals was Monisha Thomas. And in that particular process, Robin Beaumar was the number one candidate for the position. And the school board has asserted through their superintendent, through their executive directors, that that was their number one goal, was to grant the principals their top choices of candidates. But when it came to Robin Beaumar, after they made their claims of discrimination known, then the process changed yet again. And it was determined that this particular school needed a science teacher, which just so happened to not be one of Ms. Beaumar's specialties. Also, as it turns out, the candidate for that position, Monisha Thomas, she remained for one year, and then they replaced her with an individual who had the exact same qualifications as Ms. Beaumar. So your argument with respect to the Aberdeen High School position is that the requirement, the imposition of the requirement of science background is evidence of pretext? Is that what you're claiming? Not that the ñ it's the shifting rationales for the decision, Your Honor. Okay. We'll hear you some more on rebuttal. Thank you, Your Honor. All right. Mr. Constance. Thank you, Your Honors. And may it please the Court, Adam Constance, on behalf of the appellees, the Board of Education of Hartford County, and Superintendent Dr. Sean Bolson. I'm here today to request that this Court affirm the decision of the U.S. District Court for the District of Maryland to grant summary judgment in favor of the appellees with respect to appellant employment discrimination and retaliation claims. The District Court granted summary judgment in favor of the appellees because the appellants failed to set forth any genuine disputes of material fact as to whether the legitimate non-discriminatory and non-retaliatory reasons asserted by the appellees were false, any pretext for discrimination and retaliatory motives. In other words, the District Court found that the appellants could point to no facts in the record that were probative of that ultimate question in any employment discrimination case, which is a discriminatory or retaliatory motive. That ultimate question is the right question to ask at the summary judgment stage because there must be some fact in the record upon which a jury or fact finder could make such a finding and there are none in this case. I'll address some core facts which are not disputed. It's undisputed that due to a looming budget gap, the Superintendent decided to exercise his statutory authority under Maryland law to reassign staff as the needs of the school require. This was a reorganization and reshaping of the second level of school-based administrator positions, which included assistant principals and instructional facilitators. He directed HR to develop a process for making assignments rather than using an existing reduction-in-force process because the goal was not to reduce the overall size of the workforce, it was to reorganize school-based administrative staff and create strong school-based teams in that reimagined assistant principal position. And the Superintendent testified that the existing annual performance evaluation tool was not meant to be compared across supervisors and across candidates. He questioned how length of service was to be calculated under the existing RIFT process. And importantly, the Superintendent wanted to give principals an opportunity to have a say in who went into the formation of their school-based teams. And the RIFT process did not serve those legitimate interests. The selection process that was used involved the following components. The submission of a resume by the applicant. Their immediate supervisor completing a standardized reference form. The applicants participating in a digital interview in which they all answered the same questions and their scores were ranked one through five by all principal within their respective grade bands. And then the principals who reviewed all of the interviews made their top five preferences ranking in order based on their review of the interviews and the resumes. The Executive Directors in Central Office considered all of that data that was used during the process and made a comprehensive recommendation to Dr. Bolson for placements for assistant principals at each school, which he accepted. Instructions on this process were well documented in PowerPoint presentations given to all those involved and in emails. And the District Court found it undisputed that the decision makers considered in making the assignments the candidate interview scores, the top five lists from the principals which were based on their review of the resumes and the interviews, and the supervisory references submitted on the standardized form for this process. Interviews and supervisor's recommendations, right? You turn it into a beauty contest, basically. Your Honor. Isn't it? Because what you say is, well, we don't need to even look at your past performances, which I thought evaluations of past performances are very important. We don't even look at your tenure, necessarily your qualifications. That's what a beauty contest is. No, what your supervisor says about you and how you did at the interview. That's a beauty contest, really. And doesn't that hurt people who have been working there for a long time, doing well, and that somebody can come in who's been there a lot less to say, you know, hey, we really clicked in that interview. And, you know, I really like you. That's kind of a beauty contest because you just said we felt that this normal, you admitted that the normal RIF process wasn't done. We thought this is the best way to restructure them by making it almost 100% subjective, interviews and recommendations from the supervisor and not looking at a continuum of evaluations over time. Isn't that the recipe for problems like this we have? Your Honor, no. And the reason is because this Court has repeatedly said that subjective factors are proper considerations at the second stage in the McDonnell-Douglas test, especially when considering filling positions for upper-level management positions, and particularly so in the subjective criteria. We have a saying in the Fourth Circuit that I know it's kind of tough, but that you can take a situation where a person has, I mean, just categories and qualifications off the chart, and then you can say, well, no, we have an interview process here, and this person interviewed better because they related better to the supervisor. The supervisor basically likes them more. And isn't that many times a detriment, many times, for people who have historically been left out of jobs? Isn't that one of the problems in the sense that if you look at these sort of systematically, you know, if you've been there in terms of a culture, that kind of thing, don't you think you tend to do better in interviews with people who, you know, isn't that one of the problems with this? And then you say, you can't point to anything that was wrong in this process. I know you can't because we can't go back and say, I don't know how the interview went. I don't know how your recommendation went. Well, we can look at performance over time. So what I'm saying is this is the case where you're saying everything is fine, but it seems to me you took out everything that's quantitative. Your Honor, there was repeated testimony in the record that the past performance evaluation tool was not meant to be used in this context. Additionally, the interviews were standardized, and subjective criteria are properly credited at the second stage of the McDonnell-Douglas test, which the Supreme Court has said in Burdine is a very low standard, particularly when, as this Court said in Love v. Alamance, that applicants are asked the same set of interview questions. They were scored on those questions. The same instructions were given to every participant. The supervisors used standardized reference forms and were instructed to use their best professional judgment. So was there subjectivity in the process? Yes. But there were elements of standardization. You said the same question. It's amazing how you think that that satisfies it. Okay, the question that was asked is, how do you think the Constitution has been honored through the history of this country? And everybody gets the same question. You think that equalizes the record? Equalizes it at all? No, no, I'm following what you just said. That's the question. How do you think the Constitution has been implemented or fulfilled in the history of this country? That's the question to everybody. And you're saying that equalizes the playing field because then the supervisor says, hmm, I'm going to weigh what your answer was in terms of which one I like better. I don't understand how in the world that that does it because you're saying. . . That's not objective at all just because the same question was asked. Well, Your Honor, there was no evidence that these. . . I think it's undisputed, Your Honor, that the interview process was job-related. These are job-related questions, and they were scored on a one-through-five basis. It's also undisputed that the appellants, according to that metric, scored worse than their chosen comparators based on the metrics considered in this process. And there is. . . What answers did they get wrong? They were. . . It's not a wrong or right question. Exactly, exactly. That's the problem. There's no answers that are right or wrong. You just sit there and say, I like you, I like it better. That's the problem with that in terms of your reduction in workforce. You decided to put all those things aside and leave it to a process to say, one, two, three, four, five. In this record, you can't say what was wrong. That's why you didn't object. Did they ask about pedagogical type things and that kind of thing, how the students are performing? Those are the kind of things from a pedagogical standpoint you would do, but just to sit around and say, okay, how did you answer this now? I'll give that a five. You know, it's like those television shows, you know, people sing, and you're like, raise your card up, eight, nine. I don't know. Yes, Your Honor. Back to your question to my colleague about, you know, would the RIF process have resulted in any different? And the answer is no. We don't know, do we, if we had looked at performance and over time. You took all of those things that can be tracked and quantitated and you took them out. That's the whole point. I mean, history of employment, that's one of the biggest problems that Title VII tried to deal with. Yeah, well, you know, they just didn't relate as much. You know, I don't live in the same. People, for example, like somebody who, like, you know, I'm from, you know, town, small town, if I'd see somebody from my town, I'd say, hey, you're from the same place. I relate. People relate to that. That's why we try to, we don't come here and you say, well, this is objective because we had these, and you can't even tell me what the right or wrong. You admitted it right there. You said, there is no right or wrong. I'm glad you said it. I appreciate that honesty in that because that's exactly what the problem is. There's no right and wrong other than the wrongness that may be in the system that you put together in terms of who gets ripped, but not the test. The test of whether or not you go forward, and that's a problem. That is a problem. And I don't know, I think this is an interesting case there because you admit, people spend all these years, and then you say, do you agree with this? Under your system, a person could be working for ten years, doing well, perfect record, another person could come in one year, but people like them more, and they like their answers. Do you agree with that? That could happen under your system? Yes, and I think that's a perfectly legitimate reason for selecting one candidate over another because seniority, Your Honor, doesn't necessarily mean that the person is performing better or demonstrates relative strengths and weaknesses compared to another candidate. I agree with that, but it ought to be something objective to determine that it didn't. And in this case, Your Honor? That it didn't. In this case, the relative strengths and weaknesses were judged. Like I said, there's not a right or wrong answer, but they can be judged on the relative strengths and weaknesses and their ability to answer questions that are directly job-related, and that's exactly what happened in this case. Can I ask you about one individual, Ms. Bomar? My understanding is that one of your criteria for selection was the request or recommendation of the principal from the school. Is that right? Yes, Your Honor. And Principal Quigg selected Ms. Bomar as his first and only choice for assistant principal. Is that right? So you're referring to the August 2019 opening at ---- Did he request ñ did Principal Quigg say Ms. Bomar was his first choice for Aberdeen? Initially, when he was asked to select a candidate, yes. He said Ms. Bomar. However, that was not the end of the process. The objective directors ñ Why was his selection not credited at that point, when it was his first and only choice? Well, because he hadn't gone through the process yet. The process said we are going to ñ we want to have you select three candidates. But wouldn't that create a genuine issue of material fact with respect to that Ms. Bomar situation? Well ñ You said there are objective criteria. There are three components of the RIF procedure. One of them is the request or the recommendation of the principal from that school. You have a principal from that school with a request, sole request, and then that sole request is not ñ   It seems to me that would create a genuine issue of material fact, at least with respect to Ms. Bomar. Well, the question is, does it create a genuine issue of material fact on that ultimate question of discrimination? And to that I say no, and here is why. The executive directors instructed Principal Quigg to look at three candidates to see who would be the best fit for that position. At that time, the principal of that school, Aberdeen High School, had a math and science academy. At that time, the record reflects that the principal was relatively new in that role, so it was important to the executive directors that they have someone with a math background to serve that interest. Additionally, so they looked at a few candidates, including Ms. Bomar, and the successful candidate was a woman named Manisha Thomas, African-American female. She not only had the math background, which Ms. Bomar did not, but she also was an administrator at Aberdeen Middle School, came from the communities, and knew the families well. So when looking at all the candidates, not just one in isolation, Ms. Thomas was And so back to your question, Judge Berner. The evidence of the falsity of the explanation, I think, is the only, is the very surface level evidence of pretext that exists in this case, and I would submit that it doesn't, but it doesn't answer the ultimate question of whether or not there was a discriminatory or retaliatory motive. And this Court's recent cases in Hollis and Wanamaker illustrate the very sort of evidence that is required to push cases across the line to demonstrate evidence of pretext for a plaintiff to survive summary judgment, and it's very important. In Hollis, most recently decided by this Court in August of 2025, this Court vacated a summary judgment ruling of the district court in a sex discrimination case at a Morgan in denying the plaintiff tenure and setting her pay, made blatantly discriminatory and derogatory comments regarding the plaintiff's sexual orientation. That was strong evidence of discriminatory intent combined with evidence that the Morgan State failed to follow a tenure and promotion process, specifically as to the plaintiff in that case. Now, that's very different than the case we have here, where the initial decision was made not to follow a RIF process, which affected all applicants equally without regard to their protected status, and there's no other evidence of a discriminatory or retaliatory motive. In Wanamaker, Your Honor, the Court also vacated a summary judgment ruling in a claim involving race and sex discrimination case. In that case, there was testimony that the plaintiff's supervisor expressed dismissiveness and disrespect towards women generally, and that he made an explicitly racist comment about the plaintiff specifically. That same supervisor had been trying to get the plaintiff fired for years and finally did so after blaming her for not responding to an email that she wasn't even copied on and not following the company's internal disciplinary procedures in the process of terminating her. This Court found in Wanamaker that she established pretexts upon which a jury could reasonably find that her acting supervisor harbored discriminatory animus towards her, built a case against her based on misleading allegations, and ultimately terminated her on unlawful grounds. This case is nothing like this Court's recent precedent in Hollis in Wanamaker. There's very weak evidence of the falsity of the employer's explanations in this case, which I submit is only half of the pretext framework. There is no other evidence probative of a discriminatory or retaliatory motive. Indeed, the only failure – only evidence that the – my colleague points to or argument my colleague points to is the failure to follow the RIFT process, which I submit is – affects all candidates equally. And as this Court said in Wanamaker – Did you really believe that the new system you put up impacts all employees equally? The new system, Your Honor, was put into place at the beginning of the process. How could that be? I mean, intellectually, you're a very smart lawyer. Well, intellectually, how could that be? When you set up a system where I'm not going to look at performance over time, I'm not talking about tenure, I'm going to look at interviews and recommendations. How could that – older employees who have good records over time would be – you think they're equally – wait a minute. Sure. You think that's – that puts them on equal basis with someone, the people who I mean, it hurts the person who's older, tend to be, or been there for a long – and you say this yourself, just because you've been there a long time doesn't mean you're good. I agree with you. That's true. But you ought to have a system that allows them to prove that over time that they have been good. And that's – When you take that out, you hurt them. You can't get around that. You hurt them when you do that. Well, that's – You definitely do. I mean, don't you? That's common sense, don't you? Well – If a person – let's take a factory job. You go in a person that's been, you know, breaking their back for years and something, working and laboring hard and lifting things and men and women working hard, and you say, you know what, we're going to decide who's going to be foreman, but we're not going to look at whether or not you know the job and you've done it well. It's just whether or not we have an interview and whether or not you answer questions, subjective questions. You think that's equal impact to the people who worked hard for years? To the people who just walked in and hardly know how to get to the restroom in the cafeteria could come in and say, you know, I liked them in the interview. And, you know, it was cool. You know, we're like the same football team. You know, we go to the same club. Children go to the same soccer stuff. I mean, that hurts people who all they do is work hard for a long time. They're not in the social circles or whatever, but they work hard in that. And you say, that riff system, we don't want that. You admitted it. You say, we move that aside. We want this. And I asked you about it. You said it out of your mouth. There's no right or wrong answer. It's just giving an opinion. Demonstrating the relative strengths and weaknesses of each candidate to answer job-related questions. And one would think that someone who is very experienced in the job and performing well in the job for many, many years would excel in such a process, Your Honor. And so the process is designed to flush out who is the strongest, who is the weakest, and who would be the best fit for a newly imagined role of assistant principal. Go ahead. I'm sorry. I'm glad you used the word to flush out. You said it was to flush out what? Flush out the strengths, relative strengths and weaknesses of each candidate, which are legitimate non-discriminatory reasons to consider in fulfilling management-level rules. You didn't say flush out. You said flush out, didn't you? Flush out. No, no. You said flush. No, you said exactly. You said to flush out people. No, I meant to elicit responses from candidates to demonstrate their relative qualifications. Okay, counsel. And so, Your Honor, let me just close by stating this. This Court's recent cases out of Hollis and Wanamaker demonstrate the sort of evidence that is required. You're a red light to on. I see that. I will go and I will ask that this Court affirm the decision of the district court for the reasons I've stated and those in the record. Thank you, Your Honors. All right. Mr. McCormick. Your Honors, I want to address a few of the points that opposing counsel mentioned. First off, the performance evaluations, I believe my colleague on the other side stated that the performance evaluations could not be used across all candidates. It shouldn't be used across all candidates. However, included in the process that the defendants created was a supervisory reference. That supervisory reference had far less information that could be used by the decision makers, but it was used in place of a performance evaluation. The performance evaluation, however, the annual performance evaluation for the plaintiffs and for assistant principals, those are used for important purposes. The defendants concede that they were used for promotions, and that was one of the determining factors on whether or not an individual could be promoted. My colleague also mentioned that the plaintiffs were not, that the reason the plaintiffs were not selected is because they scored worse on the tools. That would include the interview scores, supervisory references, and the top five lists. We know that Latina Hall and Robin Beaumont, for one, scored well above the majority of the candidates in the process. But secondly, there was the, again, Your Honors, the defendants were not required to use any particular weighing of the factors which they used. So for the interview scores for one candidate, like Ms. Beaumont, and what they did with her is she scored very highly, so the interview scores didn't mean as much. For other candidates, the top five list was the determining factor. You have a candidate like Anjanette Cook, who was, I believe, the last, the lowest scoring candidate, and because her supervisor asked that she be retained, she was allowed to be retained. And this happened over and over again throughout the process. For some individuals, the supervisory references were the most important factor. It is very difficult to determine, well, first off, there is no determination because the process was completely arbitrary. You could use whatever factors you wanted for some candidates and other factors for other candidates, and also you could use factors outside of the process as well, because Rebecca Spencer determined that Jennifer Blangas should be her candidate, even though she stated that she was not the strongest candidate. She still wanted her because she had a heart for the kids, and she liked her, and she would be okay with mentoring. Melissa McKay, she had the disciplinary issues, and she still was allowed to participate in the process. Drew Hoagland, his performance was average, and he only had an effective rating, where my clients all had highly effective ratings. His interview score was far lower than Robin Beaumar. He was still selected. Also, he was very inexperienced. He only held the position since 2017 and was a teacher prior to that. John Simpson was named in the top five. He was one of Ms. Beaumar's colleagues. He had testing issues. He still was selected. And maybe the most important one is Kim Marine. She was selected without having to participate in the interview process at all. As far as the considerations, the decision-makers considered Zach Greenbaum, the fact that he had two little children, and considered his preparedness for a principal position. And, Your Honor, I'm not saying that you cannot be compassionate with the employees. In fact, I believe that you should have compassion for your employees and that you should consider them as total human beings. But it's discriminatory when you do it for some who are outside of the protected class, when they're younger, they're white, and they're male. But when it comes to my clients who were experienced African American women, they only considered their race. They only considered their age. And despite their experience, despite their performance, they were still demoted from their positions. So they had to go back to the school the next year in positions where people they had supervised were now supervising them. It was demoralizing. It was unfair. And it was illegal. And there's clear evidence of pretext in the record, Your Honor. So the decision from the lower court should be reversed. And on that, I'll conclude. All right. Thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Roger L. Gregory, Nicole G. Berner